I forgot. We will call the first case of the morning, number 19-51012, BITCO General Insurance v. Monroe Guaranty, and hear from Mr. Harmon. Mr. Harmon. Thank you. May it please the court. My name is Rick Harmon, and I represent Monroe Guarantee Insurance Company, which I will refer to as Monroe or MGIC in my argument. The question for this appeal is whether my client, Monroe, owed a duty to defend its insured 5D drilling based on the allegations that were asserted against 5D in a lawsuit filed against it based on the drilling of an irrigation well. The answer to that question is no, and the reason why Monroe did not have a duty to defend is because exclusions J-5 and J-6 in the policy apply to bar coverage for the claims and damages solved. The application of the analysis of the application of these exclusions is very straightforward, and it's our position that the court should reverse and render a judgment in favor of our client based on those exclusions. Quite simply, the allegations in the lawsuit were fairly sparse, but the allegations were this. 5D was hired by the plaintiff to drill an irrigation well on the plaintiff's property, and 5D agreed to drill that well through the Edwards Aquifer to a depth of 3,600 feet. Those were the allegations. In addition, the petition alleged that 5D reached the aquifer at 3,500 feet and stuck the drill bit in the borehole, rendering the well practically useless for its intended purpose. Again, that's what the petition alleged. According to the plaintiff, 5D failed to plug the well, retrieve the drill bit, or drill a new well, and then with respect to damages, the petition asserted that 5D damaged plaintiff's property, damaged the aquifer, and the plaintiff sought damages, which included what it paid 5D to drill the well, cost of reworking a new well, and consequential damages. Under those facts, again, J5 and J6 apply to bar coverage, and those exclusions are quoted at page 16 of our brief that was filed. I won't read them into the record, but they're quoted in our brief. And I will draw the court's attention to two cases that we believe directly support our position that the exclusions apply. The first case is the Cook v. Admiral Insurance Company decision from 2011, which was rendered by this court. It is cited in our briefing. That case dealt with the situation in which the insured was hired to deliver casing and oversee the running of the casing in an oil and gas well. So it's an oil and gas well, not a water well, but again, similar fact pattern. The insured brought the casing onto the site, but then took casing off the site and removed too much casing. So then when the insured was actually drilling the well, there wasn't enough casing, and so the well was drilled too shallow and could not be completed. So the insured got sued, basically for the cost of reworking the well. Under that fact pattern, this court held that exclusions J5 and J6 applied, and the court did so because it held that the insured not only delivered the casing, but it installed the casing and was operating the well at the time all the damage occurred. Therefore, the exclusions barred coverage. In that case, the insured tried to make two different arguments as to why J5 and J6 didn't apply. First, the insured alleged that J5 didn't apply because there was a gap in time between the time that the insured took the casing off the site and the time that the damage occurred or the loss of use of the well occurred. Because the exclusion does say that the damage has to occur while the insureds are performing operations, meaning present tense. The court rejected that argument and held that the well was completed incorrectly to a depth while the insured was performing the operations. And this wasn't, the court cited to one of its prior decisions, Mid-Continent versus JHP, which dealt with the situation where an insured completed work on a building, it was construction of I believe a condominium, and the damage occurred at a later point in time. Under those facts, the court held that the damage didn't occur while the insured was performing work, but the court held in this instance, in the Cook decision, that because the insured was responsible for drilling a well, just like here, 5D was responsible for drilling a well, that the exclusion J5 applied to bar coverage. The second argument the insured raised was that the insured was, the removal of the casing was distinct and separate from the loss of use of the well. And the insured essentially relied on cases that have come from this court and other courts that have held that if the insured is working on some discrete component part of a property and does defective work to that discrete part, which causes damages to some other part, that the exclusion does not apply to that damage because the exclusion says it has to apply to that particular part of the property. The court distinguished, or the court rejected that argument because it said, look, the insured here was performing work on the well as a whole. Those were the words the court used. Just like here, 5D was drilling a well into the aquifer and was performing all of the work. Therefore, the exclusion applied. Mr. Harmon? Yes, Your Honor. Your free time is up, and I'm wondering about the Gonzales case that you both commented on recently. Yes, Your Honor. They interpret that particular part narrowly. Yes, Your Honor, and I understand that case just came out and we did cite it, but as we pointed out in our letter brief to the court, we consider that case to be similar to J.H.P. and the Gore design decision also from this court where the insured was working on a discrete component part of some larger building. And, Gonzales, it's my understanding the insured was putting in siding and drove a nail through some wiring that eventually caused a fire, but the insured was hired in that case to work on siding, whereas in our case, 5D was the only party hired to drill the well, and they were doing the entire project, not just some discrete part. So, we believe that case is readily distinguishable from our fact pattern. Are you pressing the outside-the-coverage-period argument? And if so, isn't that argument somewhat in tension with the business-risk-exclusion argument in that if the suggestion is that the suit is built around just the part that was being built, the well, and the bit sticking in the well, that doesn't really harmonize with the suggestion that it was just one domino as opposed to debris falling and the aquifer then being damaged and then the free flow of water in the aquifer? I think, yeah, I understand what you're saying. We think, well, for purposes of today, we don't think the court has to get to the issue of whether the insuring agreement applies, because this is just like Cook. But Cook, there was also a property damage component of the argument, and the court just said, we don't even have to address the property damage issue because the exclusion is applying, and I think the same analysis applies here. So, you're really just focusing on the exclusion argument. And to me, that seems like the more difficult, so I agree with that. On that point, is this really – does this reduce just down to which preposition of place applies? Because you chose the word through, that they were hired to drill through the aquifer, but one could easily just say they were hired to build a well that would draw from the aquifer. And if the damage were exclusively to the well that would then draw water from the aquifer, then it wouldn't seem like the work – that the particular work was just the well, and it wasn't this whole geological structure as alleged in the Third Amendment petition. Right. The language through was obviously the language that was used by the plaintiff in the underlying case. But they also alleged that the drill bit got stuck at 3,500 feet in the aquifer. The issue of drawing the water out of the well, I guess the case that we cite too extensively, the CBX case, if you're drilling into a reservoir, whether it's for oil, gas, water, if you damage what you're drilling into as part of that operation, then it's our position that the exclusion would apply to that damage as well. Because you're being hired to drill into a formation, whether it be an aquifer or a reservoir for oil and gas, to extract something out of it. And if you damage it while you're drilling into it or through it, then that is that particular part of real property. I got a little – you probably know that case well, and I looked at it because you emphasized it. Judge Ezra, do you remember footnote four? It really wasn't clear to me whether he was saying that the exclusion would apply even to damage to the oil field. I couldn't discern from his footnote whether he agreed with what you're saying or not as to damage to an oil field. And I saw that footnote, and I understand that there may not be some clarity. But one thing is clear, that the damages that were sought included the oil and gas that could not be extracted from the reservoir, which presumably meant based on the damage to the reservoir, and that was excluded. And that's the closest analogy that I can make. You know, Cook did not involve a situation where they were claiming the reservoir was damaged. That was simply a suit for reworking of the well. But I do think that Cook's important because in the CBX decision, Judge Ezra quoted extensively, as you probably noted, from Cook and held the same thing, that there was – you know, the words that were used were the domino effect. And he said there was no domino effect because the insurer was working on – they were hired to drill a well, and that's what they did. They drilled a well, but it fractured. That's what happened in the CBX. There was a fracture in the casing, and I believe it was 3,400 feet. And so everything below where the casing fracture was lost, and presumably that – you know, it could not be manipulated out of – the oil and gas couldn't be manipulated out of the well. So the damage – or the exclusion applied to all the damage. And that's what we're saying here. I mean, it's – in our opinion, the CBX drilling case is – the only distinguishing factor, really, is there was an oil well being drilled in CBX, and in our case, it was a water irrigation well. But the similarities are striking, and again, in that case, Judge Ezra did hold that exclusions J-5 – he relied on J-5, which I really think is probably the exclusion that applies here is J-5 because you're dealing with real property. And I think that the only real issue here is, is the aquifer part of the property that our industry 5D was working on. I really don't think there's any dispute that all the other damage would be excluded because they were drilling the well. So any damage to the well bore or anything else would be excluded. The issue is whether the aquifer is something they were working on, and our position is because they were hired to drill through the aquifer and extract water from the aquifer – and in fact, the petition says that the drill bit got stuck in the aquifer – that they were working on the aquifer at the time, and that is that particular part of real property, and that the exclusion applies to all of the damages. And I was going to also bring to the court's attention – and I apologize because we didn't file a letter brief on this – but there was another new case that came out very recently, Kinsel v. Topsy Oil, that dealt with a fact pattern that was much similar to Cook, where the well was drilled too shallow, and that's an eastern district of Texas case. It was rendered on September 9, 2020, and in that case, the court also held that exclusions J-5 and J-6 applied, and essentially, again, adopted the reasoning of Cook and said that the damages were all excluded. And I believe those damages did include damage to the reservoir itself, and I apologize again because this case just came out, and we didn't file a letter brief on it, but I do think it supports our position. And by the way, I should tell the court that that's on appeal to this court right now. Well, Mr. Harmon, you can file a letter after argument citing that case. Thank you, Your Honor. You have time reserved for rebuttal. We'll go to Mr. Farmer for BITCO. Good morning, ma'am. Please, the court. Morning. I was first going to address the grant of coverage under the policy because I feel like we're going a little bit backward by doing the exclusions first, but because Mr. Harmon addressed the exclusions first, I'm going to go ahead and address the exclusions first as well. And I think there's one thing that Mr. Harmon and I do agree upon, and that is the crux of this issue with respect to exclusions J-5 and J-6 is whether there is damage to any property that was not that particular part of the property on which the insured was working at the time. And that is the key here, and I believe that Magistrate Chesney correctly evaluated this issue when she said that the damage to allegations with respect to damage to the aquifer itself would be damage to either other property or certainly that particular property on which the insured was not working at the time of the incident, which would mean that it falls outside of those exclusions. And in the context of these exclusions, I think it's also important to address Texas law with respect to the eight corners rule and the liberal interpretation of the pleadings that must be given the policyholder in these circumstances. And here, of course, my client Ditko and MGIC had a mutual insured. We agreed up until the time the third amendment petition was filed that no duty of defense was triggered. It was not until the third amendment petition was filed that we believed allegations of damage to the aquifer potentially triggered defense, which is the guiding principle under Texas law. The eight corners rule is part of the bedrock of Texas law. This court recently issued an opinion based upon or certified a question to the Texas Supreme Court who said you don't need special policy language in your policy to trigger the eight corners rule. The eight corners rule is what determines whether a duty of defense is owed by an insurer to a policyholder under Texas law reference to the pleadings and to the policy. Determine whether that duty is triggered here. I understand Judge Higginson's reference to the through or to comment with respect to the language of the pleading. Whether our mutual insured was hired to work on the entire well or the aquifer may or may not matter. But here, they were not working on the aquifer itself when the drill bit got stuck. They were simply drilling to the aquifer. And that is what the quote that particular part close quote language of this exclusion is intended to do to limit its application to the discrete part of the work that the insured is performing not to extend to other work by the insured that is not defective or to other property. And here, the allegations of damage to the aquifer itself or the fleet free flow of water to the aquifer. Take it. Take the allegations outside of J5 and J6 for the purposes of determining whether a duty of defense has been triggered. I thought I might have a question there, but I do, but I'm waiting till the time. I will go ahead and address your questions if you prefer. I want to make sure I get those answered. Judge Jones, may I? Yes, sir. Well, you just worry. I mean, I appreciate it. And this is being well argued by both of you. But you were emphatic that the damage occurred when it was the drill was being drilled to the aquifer. But but I guess that's just verifiable on the record because his statement was the drill had already gone through it. And it was at a depth that was inside the aquifer. Is that a spatial difference that matters or not? You very carefully said that the damage occurred as they were drilling to the aquifer. I don't think that it matters from our standpoint. And again, I think this was addressed by Judge Chesney in her recommendations to Judge Beery. And that is the aquifer itself was not the subject of the work at the time of the damage. The subject of the work was the drilling to the aquifer. And I believe that is the distinction that the damage alleged is to even even if we assume the insured was hired to work on part of the aquifer. That was not that particular part of the work that was being performed at the time the drill bit got stuck. You're not drilling for fun, though. And I have a geological question here. Is the aquifer constructed like a salt dome, which is to say that you have to drill through the dome to get down to where the reservoir is? Or are you drilling down to a certain level where there is, you know, so much water permeating the aquifer that you can sip it like from, you know, sort of the rock inside there? I believe this is my understanding. And I want to preface this by saying this is certainly not my area of expertise. But my understanding is it is stratosphere of rock and more akin to the second description you gave, which is water permeating through there that is then pulled from the reservoir. Sort of out of a honeycomb or something. Yes, ma'am. In my humble opinion, it's very difficult to separate the permeate permeations in the aquifer from the entire purpose of the drilling. I mean, not just in theory, because you drill a hole in the ground. And if there's water way down there, it's not like a house. It's the sum of many parts. Without the water, there's nothing. I agree. Yeah. And, you know, if you look at that Gonzales case, for instance, you can have a house without electrical wiring. You can have a house with different kinds of siding. But all you need is a structure that covers something. Whereas with a well, you drill a hole, because if you don't reach the water, you don't have a well. In other words, what I'm saying is I'm finding it difficult to parse your argument about a particular part, excluding the object of the enterprise, which was piercing water through the aquifer. Yes, ma'am. And I think that I envisioned the drill bit being drilled into the ground. And even if it's permeating sections of the aquifer as it's getting there, the allegation was the drill bit became stuck in the well. It didn't say it became stuck in the aquifer. And so the aquifer was not the subject of the work. It was not that particular part of the work. That the mutual insured was performing. It was simply the means to get to the water. Let me ask you a question about the relevance of the size of the aquifer. It's approximately 3,600 square miles. It covers parts of McKinney, Uvalde, Zavala, Medina, Frio, Anacostia, Bear, Comal, Guadalupe, and Haste. We've been in litigation before with this aquifer in terms of water sources, et cetera. It's one of Texas' great resources. But this is the sheer size of it makes it quite different from some tank or some immediate container of water. And so far as it being a central dome, it's actually characterized as sinkholes, sinking streams, caves, large springs, and highly productive water wells. Now, my question is, what do we do with that reality? And with this language, it certainly is exclusion. Yes, I think that's an excellent point. And I think that the fact that the insured may own the, quote, water beneath his property doesn't mean that the allegations in this case are limited damage to that water. It was simply an allegation that it was alleged to the free flow of water. And I think your comment highlights maybe better than the way I was saying it before. And that is, the aquifer itself was not that particular part of the insured's work. And I think the information you just provided about the aquifer establishes that fact. There's certainly no allegation that the damage to the aquifer itself was limited to the aquifer that flows below the insured's property. You would have to make an inferential leap to even get there. So I believe that sheer size of the aquifer and the nature of what it is means that the allegation of damage to that structure, for lack of a better word, is an allegation of damage that is not within that particular part of the insured's work. Let's come at it another way. What part is the particular part that is not covered? Is it 3,500 feet of well? Is that what you're saying? No, well, I hadn't thought about that exactly because that wasn't the subject here. But I think that certainly the drilling up to the point of it being stuck would be that particular part of the work. Because that's the allegation, that the drill bit got stuck. So you can't avoid that part of it. But with respect to the casing and the other arguments that were made, I'm not sure that this would even necessarily apply to those elements. Because that particular part, the casing is not that particular part that they're alleging was negligently performed. Let me ask you. Your company, I assume, had an insurance policy that was essentially the same wording as Mijic's? Yes, yes, Your Honor. All right. And you agreed to cover it. Or did you agree? Are you doing it defending subject to coverage defense? No, no, ma'am. In fact, my client has already resolved the underlying dispute. So this is strictly limited to the defense issue at this point. We did defend subject to a reservation of rights. But they nevertheless decided to resolve the dispute and were able to do so amicably. And that is not the subject of this, and we are not intending to seek reimbursement for MGIC with respect to those damages. We're simply seeking the defense costs. In our discussion with Mr. Harmon, would you agree that there is at least tension in the case law as to a narrow interpretation? And that being, say, Judge Oldham's decision in Gonzales from a month or two ago versus the cases that he's drawing our attention to, CBX, Cook, especially CBX, which seems to be quite parallel. Would you? Would you? So this is a multi-part question, if you can keep it separate. One is, is there tension in the law narrow, broad as to these exclusions? And the other is focused on CBX. Do you read Judge Ezra to be saying, well, any damage to the oil field really was part of the one domino that fell as a result of the well damage? I do not read it that way. I read it to say that the well itself, and I think the footnote you pointed out earlier, I interpreted that without even giving it a second thought, that the judge was saying that if the oil itself, that what you're going to draw out was damaged, then that would be a different story. That is the way I interpreted that footnote. And again, that was, I never even gave it another interpretation until you raised it this morning as possibly being, and I understood where you were going with that. But my, the tension in the case law exists to answer that question. There's no question about it. I don't, I don't think I could legitimately sit here, stand here today and with a straight face and tell you that there is not some tension in the case law with respect to how these exclusions apply. And that sometimes it seems like hairs are being split with respect to whether an exclusion applies or doesn't apply. But because of that, again, to stress my arguments earlier about the eight corners rule and the liberal interpretation of the pleadings that have to be given, and the favor that has to be given in favor of coverage, I believe established, especially in a circumstance like this, where the allegation does not specifically allege that the ensured work on the aquifer, that the allegations of damage to the aquifer remove it from that particular part. Well, number one, I mean, I definitely am grateful for lawyers who acknowledge when there's tension, because that's what I saw too. This is sort of an esoteric question, but, but can you always, as a result of pleading, if someone tags on a sort of pal graph, pals graphian, you know, oh, it also affected the free flow of water. Will that always end up getting around business risk exclusions? You see what I'm saying? If really the lawsuit is 98% about the well and the casing and the bit stuck, if they just make some odd extraneous comment about water being obstructed, does that mean all of a sudden the duty to defend will apply? Under Texas law, I think it does. And that is because the rules are, if any allegation triggers a duty to defend, a duty to defend is triggered for the entire lawsuit. I'm not saying that's necessarily a fair result for insurance companies, as we both represent insurers in this circumstance. But I think it's a correct application of the law in this circumstance, which is we have allegations that an insured not only performed defective work, but that that defective work actually damaged other property. And whether that property was a subject of his work is somewhat irrelevant because it's not the subject of that particular part on which it was performed negligently. And the interpretation of these exclusions, as you pointed out, has been the subject of many, many, many decisions under not just Texas state law, but also under federal cases, federal courts implying Texas law, as well as this court's application of Texas law. And they all have somewhat of distinguishing factors, many of which I feel like could be argued in either direction. In fact, when I was preparing for this, I thought if I was a law school professor, this would be a fantastic case to get to a law school class because our arguments are, as you said, somewhat esoteric and certainly academic on many levels. Is there one Texas case you derive most support from? Good. On the J-5 and J-6 exclusions, I was more focused on the Fifth Circuit's opinions mostly in Gore and Mid-Continent. Those are the two that I felt like, and this is also as Judge Chesney pointed out, were the most similar or more similar to these facts, which are allegations to damage to defective work, but also allegations of damage to other property. And that distinction was again made recently by this court and the Gonzalez decision that you mentioned earlier from just, I believe, just a few weeks ago. And again, similar to the Gore and the Mid-Continent decisions that this court has also addressed and that we also discussed in our briefing. Mr. Farmer, looking at this just from a practical standpoint, I would be more sympathetic to your argument if the drill bit had gotten stuck in the hole 200 feet down in a proposed 3,600 feet well than I would when it's right on the cusp of completion. And that being the only object, all the cost has been invested in the hole. And presumably the landowner is on the hook for a half million dollars at that point, whereas if they had only drilled 100 feet or 200 feet, it would be a minuscule proportion of that. And so I'm wondering, does the extent of the particular part have any reference whatsoever to the ultimate objective of this hole? I don't believe so. And the reason is if you use that standard, whether the ultimate objective or the contract that the insured was required to perform as the standard of that particular part, essentially, unless there was damage to work or to property that the insured wasn't hired to work on, the exclusion would never apply. And that's certainly not the case because the case law is clear that it can apply to non-defective work performed by the insured as well as other property on which the insured was not performing any work at all. So the depth of the well, while an intriguing proposition, I believe, that's really just a matter of how much of the insured's work had been done before the damage to either other property or other work that he had not yet performed or had performed non-negligently had occurred. Well, the problem with a well hole is it's all negligent if only, you know, it's useless, whereas the wiring in that house in Gonzales was not entirely useless or the siding. That's true. And the well itself is useless. But again, we're not arguing that that necessarily is not part of the insured's work. But the aquifer itself was damaged, but it was not rendered useless. How was the aquifer damaged? In what sense? Well, the allegations were that there was a lot of debris or slough off from the drilling that eventually made its way into the aquifer and made it potentially dangerous for consumption. I'm not saying I agree with that, but those were the allegations. That's really hard to believe, frankly, but people can allege what they want. And I don't see how the landowner could say he's damaged in that regard anyway, because you always, you drill another hole and you're not subjected to that slough off. Right? I would think so. Yes. OK, well, Mr. Harmon, you have an opportunity for rebuttal. Yes, Your Honor. Thank you. OK, so on what was actually alleged in the third amended petition, because that is what is relevant to the duty to defend, this is actually what the petition says. Defendants reached the Edwards Aquifer at approximately 3,500 feet and while negligently drilling, stuck the drill bit in the borehole, rendering the well practically useless for its intended contracted for purpose. OK, so they allege that the drill that had reached the aquifer when the drill bit got stuck. So it was in the aquifer. So again, it's our position that 5D was working on the aquifer based on the allegations in the pleading, which is what we have to go by for purposes of the duty to defend. And then on what went down the borehole, this is all the petition says. It says defendants have failed and refused to plug the well, retrieve the drill bit and drill a new well. In addition, the well in question deviates in an unacceptable fashion from vertical. Also, the defendants failed to case the well through the Del Rio clay, allowing detritus to slough off the clay, falling down the borehole and filling up the well. OK, there's no, there's no, there's no allegation here that this happened like sometime later, like in the Mid-Continent decision. There's nothing in here that says that any debris fell down into the aquifer. That's simply not alleged. Now there is an allegation that the aquifer was damaged, but it doesn't say how it was damaged. In terms of the aquifer itself, the plaintiff's recovery, if there was damage to the aquifer, the plaintiff's recovery would be, their only recovery would be for what water they couldn't get out of the aquifer due to the insurer's improper drilling of the well. That would be their measure of damage, would be the inability to get the water out of the well, just like the oil and gas in the CBX decision. And that would be the measure of that. In terms of tension in the law, which was raised, I agree that there is, there is tension in the law, but I think it can be distinguished, especially here, because you have the line of cases like Gore Design and the Mid-Continent decision and the New Gonzales decision, that deal with the situation where the insured is doing work on a discrete component part of a bigger property as a whole. And if the insured does, the insured's defective work on that particular part causes damage to other property, then the exclusions don't apply. And I agree with that. But here, our insured was hired to drill a well through the Edwards Aquifer, and the drill bit got stuck, according to the allegations in the Edwards Aquifer. And based on the allegations here, there is no tension in the law, because we have not only this court's prior decision in Cook, but we have the CBX decision that deal with this fact pattern, and under that fact pattern, hold that the exclusions apply. And one other thing on the business risk part of this, which I believe was also addressed, the business risk exclusions, this is what they're supposed to apply to. The insured is hired or contracted to do a particular type of work. They do that work, they damage everything that was their work, and everything's excluded. And that's what they were designed, J5 and J6 were designed to do, was exclude this type of damage. What coverage would that leave you with? Well, in this instance, it would leave you with no coverage, simply because all the damage was to the insured's work. But the exclusions don't apply to other damage. So, for instance, in the Gonzalez case, the whole house burned, right? Well, the insured's not, the exclusion's not going to apply, so in that instance, the insured gets coverage for the liability for the damage to the house. But the insured didn't contract to build the whole house in that case. They contracted to put on siding. So, I understand the logic for why the exclusion doesn't apply in that instance. Here, our insured contracted it fairly well through the aquifer, and all the damage associated with that, including damage to the aquifer itself, should be excluded by exclusions J5 and J6. Mr. Harmon, isn't it possible that there are two different policies here? One of them is the contractor's CGL policy, and the other is his professional negligence policy, right? Yes, Your Honor. And the point is that they're not supposed to overlap, because the CGL does not insure against a moral hazard of defective performance of your work. Exactly. And there were allegations of essentially professional negligence here in the petition. I presume that 5D didn't have professional liability coverage, so they didn't turn it into their carrier, but you're right. This is not the type of a loss that a CGL policy is supposed to insure against. All right, gentlemen. Thank you very much. We have your argument. It's an interesting case, and bye-bye. Bye. Thank you. Thank you.